J-S45019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAYSHAWN MALIK JOHNSON | : | |
| | : | |
| Appellant | : | No. 63 MDA 2023 |

Appeal from the Judgment of Sentence Entered January 4, 2023
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0001846-2021

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED: MARCH 19, 2024**

Jayshawn Malik Johnson appeals from the judgment of sentence, entered in the Court of Common Pleas of Luzerne County, following his convictions of two counts of homicide,[1] and one count each of aggravated assault,[2] aggravated assault with a deadly weapon,[3] criminal attempt—

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2501(a).

[2] *Id.* at § 2702(a)(1).

[3] *Id.* at § 2702(a)(4).

homicide,[4] and firearms not to be carried without a license.[5]   After careful review, we affirm.

On January 30, 2021, Johnson shot Damien Thomas, Maurice Chapman, and Alquan Cade outside of Bo's on Main, a bar located at 215 South Main Street in Wilkes-Barre.  Police were dispatched for reports of gunshots and multiple injuries.  When police arrived, Thomas, Chapman, and Cade had all suffered gunshot injuries.  Thomas and Chapman died as a result of their wounds.

Police recovered surveillance footage from 15 cameras[6] located throughout the interior and exterior of Bo's on Main.  Additionally, police obtained video surveillance from two cameras from a neighboring business, Ali Baba Lounge.  Police reviewed the January 30, 2021 video surveillance at timestamps of 7:50 p.m. to 11:33 p.m.[7]  At 7:50 p.m., the video depicted a

_____

[4] *Id.* at § 901(a).

[5] *Id.* at § 6106(a)(1).

[6] Lieutenant Joseph Mangan of the Wilkes-Barre City Police Department testified that Bo's on Main had 16 cameras, but that one was inoperable on the night of the shooting.  *See* N.T. Jury Trial (Day 1), 10/31/22, at 285-87. Additionally, Lt. Mangan was admitted as an expert in video analysis.  *See id.* at 282-84.  Lieutenant Mangan explained that some of Bo's on Main's exterior cameras utilized night vision.  *See id.* at 292-93.

[7] Lieutenant Mangan testified that this time period encapsulates Johnson's first arrival to Bo's on Main, second arrival, and his departure after the shootings. *See id.* at 287-90.  Lieutenant Mangan further testified that Bo's on Main's surveillance footage was "approximate to actual time," which he explained as meaning the timestamps on the surveillance video were accurate.  *See id.* at
*(Footnote Continued Next Page)*

black sedan arrive and park across the street from Bo's on Main, and shows three people exit the vehicle and enter the bar. One of the individuals was identified as Johnson, a second individual was identified as Tamara Dixon, and the third individual was not identified.

A short time later, Johnson, dressed in dark clothing, left the bar with the unidentified individual. At 8:42 p.m., the video depicted Johnson, now wearing a dark jacket with stripes on the sleeve and the word "White" written across the back, as he returned to Bo's on Main with the unidentified individual in a dark vehicle. This excerpt depicted Johnson wearing the same sneakers as he was wearing earlier in the evening.

At 10:17 p.m., Thomas entered Bo's on Main. At this point, Johnson was wearing a plain black jacket. The unidentified individual exited Bo's on Main, walked to the vehicle, retrieved a backpack, and reentered Bo's on Main without interacting with the bar security personnel positioned at the entrance. Moments later, Johnson is seen on video taking the backpack from the unidentified individual and covering the backpack with the dark jacket with the word "White" on the back.

Shortly thereafter, Johnson entered the bathroom with the backpack. Johnson, now wearing a different jacket, returned to his seat, placed the dark

---

289-90 (Lieutenant Mangan explaining Bo's on Main's timestamps were accurate, in contrast to other surveillance systems which may not account for Daylight Savings Time). Lieutenant Mangan additionally testified that Ali Baba's Lounge's surveillance system was 21 minutes faster than actual time. *See id.* at 315.

jacket with the word "White" onto Dixon, and adjusted a large bulge in his waistline. At this point, Dixon gave her face mask to Johnson, who put it on.[8] Johnson and the unidentified individual proceeded to the bar. Thomas walked past the two, and Johnson tapped the unidentified individual. Thomas and Cade exited Bo's on Main and Johnson and the unidentified individual followed him. The unidentified individual entered the vehicle he and Johnson had arrived in and turned it on. At the same time, Johnson continued after Thomas and Cade, pulled a firearm from the right side of his waistband, and shot Thomas three times.[9] Johnson then shot Cade.[10] As a result of the gunfire, Chapman, who was already outside, attempted to flee the scene. Unfortunately, Chapman inadvertently ran towards Johnson, who turned,

---

[8] This incident occurred during the COVID-19 pandemic. However, almost nobody in Bo's on Main, including Johnson, was wearing a facemask. *See id.* at 303 (Lieutenant Mangan testifying that there were very few people masked in Bo's on Main's surveillance video). Dixon was one of the few people wearing a mask. *See id.* at 294.

[9] Thomas suffered five bullet wounds caused by three bullets. *See* N.T. Jury Trial (Day 2), 11/1/22, at 487-88 (Doctor Charles Siebert testifying he performed autopsies and located five wounds caused by three bullets). Doctor Siebert testified that one of the bullets perforated Thomas's left arm and penetrated his chest. *Id.* at 488. Doctor Siebert testified that Thomas was also shot in his back, and in his shoulder. *See id.* at 490-91.

[10] Cade was shot once in the head and several times in his shoulder. *See* N.T. Jury Trial (Day 2), 11/1/22, at 477-78. Cade survived the shooting, but as a result of his injuries, has permanently lost one of his eyes, has constant pain in his face, head, and shoulder, has significant issues with memory recall, and had brain fluid leaking into his stomach. *See id.* at 477-80.

aimed the firearm at Chapman, and fired, striking Chapman and killing him.[11] The surveillance footage then depicted Johnson enter the dark vehicle, and leave the area with the unidentified individual. After the car left the scene, Dixon is seen on camera wearing the dark jacket with "White" written on it and fleeing on foot. Shortly thereafter, police arrived on scene. Cade was transported to Wilkes-Barre General Hospital.

As it is related to Johnson's claims on appeal, we additionally summarize the relevant factual history relating to the police investigation. Detective James Conmy assisted in the investigation.[12] *See* N.T. Pre-Trial Hearing, 8/4/22, at 5-49 (Detective Conmy testifying he investigated shooter's identity). Detective Conmy viewed the surveillance footage and identified Johnson as the shooter. *See id.* at 14-18. Detective Conmy confirmed Johnson's identity by checking the Facebook page of a person known to Detective Conmy as "Times Too," and by checking Johnson's personal Facebook page. *See id.* at 15-16 (Detective Conmy testifying about "Times Too's" Facebook page); *see id.* at 40-41 (Detective Conmy testifying, on re-direct, about Johnson's personal Facebook page); *see also id.* at 40-42 (Detective Conmy testifying that both "Times Too's" and Johnson's personal

_____

[11] Doctor Siebert testified that Chapman was shot once, in the back, and that the bullet went through Chapman's heart. *See id.* at 492-93.

[12] At the beginning stages of the investigation, Detective Conmy was Officer Conmy. However, during the course of the investigation, Officer Conmy was promoted to detective. Thus, for the purposes of this memorandum, we refer to him as "Detective Conmy" throughout.

Facebook pages contain multiple photos of Johnson). Detective Conmy believed "Times Too" and Johnson to be the same person. *See id.* at 14-15. Detective Conmy compared stills from the above-recovered videos with photos of "Times Too" from Facebook, as well as photos of Johnson on his personal Facebook page, JNET, and CPIN. *See id.* at 14-16, 40-41. Detective Conmy was familiar with Johnson based on two previous encounters with him.[13] *See id.* at 10-14.

While Detective Conmy reviewed "Times Too's" Facebook page, he noted mention of a female named "Diamond Cashington." *See id.* at 16-17. Detective Conmy was able to determine that "Diamond Cashington" was, in fact, Dixon. *See id.* at 16-18. Detective Conmy testified that "Diamond Cashington's" Facebook page URL listed "Tamara Dixon." *See id.* at 16. Detective Conmy cross-referenced still images taken from the surveillance footage, with images of "Tamara Dixon" in the police department's database. *See id.* at 16-17. Utilizing this method, Detective Conmy learned that Dixon had a last known address of 324 Parkview Circle, apartment 705, at the Sherman Hills Apartment complex. *See id.* at 17-18. Detective Conmy retrieved video from the Sherman Hills Apartment complex for January 30, 2021, and January 31, 2021. *See id.* at 17. On the video, police saw Johnson and Dixon leave prior to the shooting on January 30, 2021, and return around

_____

[13] Detective Conmy testified, at the August 4, 2022, pre-trial hearing, that he was familiar with Johnson from prior investigations at Sherman Hills Apartment complex and "Peter's Deli," respectively. *See id.* at 10-14.

3:30 and 4:00 a.m., respectively, on January 31, 2021. *See id.* at 17-18. The video depicted Johnson wearing the same clothing and sneakers as seen in the videos from Bo's on Main and Ali Baba Lounge. *See id.* at 18, 20-21. The video depicted Dixon wearing the dark jacket with the word "White" on the back. *See id.* at 21-22. Detective Conmy testified that video surveillance depicted Johnson leaving Sherman Hills Apartments between 10 and 11 a.m. on January 31, 2021. *Id.* at 49.

Based upon the foregoing, police sought and obtained a search warrant for Dixon's apartment in order to find the dark jacket with the word "White" on it, as well as a "dark colored baseball style hat, dark colored pants, dark and light colored Nike sneakers that [] Johnson was wearing on January 30, 2021, firearms, ammunition[,] and any paperwork identifying or belonging to [] Johnson, cellular telephone or any digital storage media that would depict [] Johnson's locations or contacts on the night of the homicide." *Id.* at 22-23. During the search, police recovered the dark jacket with the word "White" on it. *See id.* at 23-24. Police did not recover any of the other items sought in the warrant. *See id.*

Subsequently, police obtained an arrest warrant for Johnson, alleging *inter alia*, homicide. Police were unable to obtain any additional information from the "Times Too" Facebook page, because the page had been deleted

during the investigation.[14]   **See id.** at 41-42.   Ultimately, Johnson was apprehended by the United States Marshals in Miami, Florida.

The dark jacket with "White" written on the back was sent for DNA testing to the Pennsylvania State Police (PSP) Laboratory and then to Bode Labs in Virginia for further DNA testing.  Bode Labs concluded that Johnson could not be ruled out as a contributor of DNA on the cuff of the jacket.  In particular, Bode Labs' results indicated that there was a mixture of DNA present on the cuffs and neckline of the jacket.  **See id.** at 411-60 (Lyndsey Sanney, Commonwealth's DNA expert, testifying regarding DNA mixture and presence of Johnson's DNA).

Upon Johnson's return to Pennsylvania, the Commonwealth filed Criminal Information against him, charging him with the above-mentioned offenses.  On June 17, 2022, Johnson filed a suppression motion challenging various statements he made before and after being administered his **Miranda**[15] warnings.[16]  Additionally, on June 30, 2022, Johnson filed a second suppression motion challenging the search warrant.  In his June 30, 2022

---

[14] We observe that, after the pre-trial hearing, and prior to the jury trial, Ali Abualburak, the general manager of Ali Baba's Lounge, provided images that he had downloaded from the "Times Too" Facebook page.  **See** N.T. Jury Trial (Day 2), 11/1/22, at 467-69.  Abualburak testified that he had downloaded the images shortly after the shooting because he had heard that "Times Too" was the shooter.  **Id.**

[15] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[16] On July 5, 2022, the trial court granted this suppression motion.

suppression motion, Johnson argued that the search warrant was based upon a misstatement of fact in violation of **Franks v. Delaware**, 438 U.S. 154 (1978).[17] Additionally, Johnson challenged the search warrant as overbroad, and challenged the search warrant's purported lack of probable cause.

On August 4, 2022, the trial court conducted a pre-trial hearing, at which the Commonwealth presented testimony of Detective Conmy, described *supra*, as well as evidence of his investigation to support the search warrant. At the end of the pre-trial hearing, the trial court ordered Johnson to file a brief in support of his suppression motion and afforded the Commonwealth fifteen days to respond. Both parties complied, and, on October 26, 2022, the trial court issued an order and opinion denying Johnson's June 30, 2022 suppression motion.

On October 31, 2022, Johnson proceeded to a four-day jury trial, after which he was convicted of the above-mentioned offenses. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report. Johnson filed a post-trial motion arguing that the verdict was against the weight of the evidence, which the trial court denied.

_____

[17] In **Franks**, the United States Supreme Court held that,

> [w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the findings of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

**Id.** at 154.

On January 4, 2023, the trial court conducted a sentencing hearing. The trial court sentenced Johnson to two terms of life without parole (LWOP) for his homicide convictions. On the remaining offenses, the trial court sentenced Johnson to an aggregate term of 270 to 540 months in prison. All of Johnson's sentences were imposed consecutively. Johnson did not file a post-sentence motion.

Johnson filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Johnson now raises the following claims for our review:

1. Whether the trial court erred in failing to grant Johnson's motion to suppress.

2. Whether the trial court abused it discretion in issuing a flight charge to the jury.

3. Whether the trial court erred in not granting a new trial.

Brief for Appellant, at 1 (cleaned up).

In his first claim, Johnson raises three sub-issues challenging the search warrant, which we address separately.

Our standard of review in addressing a challenge to a denial of a suppression motion is well settled:

[This Court] is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record,

- 10 -

[this Court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa. Super. 2015) (citation omitted). Moreover, "[i]t is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Baker*, 946 A.2d 691, 693 (Pa. 2008) (citation omitted).

Instantly, each of Johnson's suppression claims challenges the search warrant, which provides, in relevant part, as follows:

On January 30, 2021 at 23:33 hours Luzerne County 911 received a report of a shooting at "Bo's on Main" located at 215 South Main Street in Wilkes-Barre, Pa. Responding patrol units arrived on-scene and observed three male gunshot victims.

Detectives from Wilkes-Barre City Police and the Luzerne County District Attorney's Office determined that two males were deceased, and one male was listed in critical condition. All males were transported from the scene to Wilkes-Barre General Hospital. Victim #1 Damian Odiel Thomas, and Victim #2 Maurice Chapman were both pronounced dead from apparent gunshot wounds at Wilkes-Barre General Hospital by Luzerne County Deputy coroner Kailyn Keating. Victim #3 AlQuan Cade Jr. was admitted into the Intensive Care Unit in critical condition suffering from a gunshot wound to his head. Victim #3 has lost sight in his left eye from the injury he sustained.

Video surveillance cameras from the area captured the incident and depict a group of patrons standing outside Bo's on Main. An unknown male is standing on the sidewalk nearby and is seen walking towards Victim #1 Thomas before firing a gun at him and several persons then fleeing on foot through a parking lot across from the business. Victim #2 and Victim #3 were also struck by the gunfire.

Surveillance cameras from the area also captured video from before the shooting incident occurred. This footage captures the suspect inside the business. He is seen wearing dark colored

- 11 -

clothing and Air Jordan sneakers.  This clothing was observed to be worn by the suspect on previous surveillance video.  All footage has been secured as evidence.

As the suspect is seen walking inside Bo's on Main, a clear image of his face is captured.  Law enforcement was able to positively identify the suspect as Jayshawn Johnson AKA Times Too and is known to law enforcement from past police contacts and from comparison of known images of Johnson.

* * *

On January 31st at 15:00 hours Det. Stash and Ofc. Conmy discovered that Johnson has a girlfriend who resides in Sherman Hills at 324 Parkview Cr apt #705.  They reviewed video from the area of this address and observed Johnson arriving at the apartment at 03:30 hours.  He is seen wearing the same clothing from the shooting incident.  He is also carrying two garbage bags of clothing and other unknown items which may have evidentiary value relevant to this investigation.  Additionally, it was discovered that Johnson deleted his Facebook account on this date which is commonly done when attempting to avoid law enforcement tracking and apprehension.  It has also been my experience that cellular smartphones are commonly used to access social media platforms including Facebook.

Lastly, that smartphones are capable of storing locations, GPS, and related data.  Johnson arrived at Bo's on Main.  Afterwards a vehicle arrives prior to the shooting and was parked close to the scene.  Johnson was observed talking to the unknown male who was driving this vehicle.  Moments before the shooting, the unknown male appears to be showing Johnson where the vehicle is parked.  Johnson is seen running and entering this vehicle immediately after the incident.  The vehicle was already occupied by the unknown accomplice and running in preparation to flee the area.  It appears that Johnson conspired with the unknown male to arrange to flee the scene.  Johnson's call logs and location data are likely stored on his smartphone and have evidentiary value and relevance to this investigation.

Investigators have reasonable belief that Johnson is currently staying at the listed address and are requesting a search warrant be approved to seize the mentioned items that will further this criminal investigation.

N.T. Pre-Trial Hearing, 8/4/22, Commonwealth's Exhibit 6 (Search Warrant). Further, the search warrant listed several items including, but not limited to, a "dark colored jacket with the word 'WHITE' in light-colored lettering, and light-colored stripes on the back and sleeves of the jacket." *See id.*

In his first sub-issue, Johnson argues that the search warrant must be found to be invalid because it was based upon a "misstatement of fact" in violation of *Franks*. *See* Brief for Appellant, at 4-7. Johnson contends that the Commonwealth based its entire identification of Johnson based upon Detective Conmy's identification of Johnson, which, in turn, was based upon a video that depicts the shooter wearing a hat and sunglasses obscuring the shooter's eyes. *See id.* at 6-7. Johnson posits that the Commonwealth's representation that this still image was "clear" is an impermissible misstatement of fact where the images show the actor's face obscured by either glasses or a hat. *See id.*

In addressing a *Franks* claim, courts of this Commonwealth have held that "misstatements of fact will invalidate a search warrant and require suppression of the fruits of the search **only if the misstatements of fact are deliberate and material**." *Commonwealth v. Baker*, 24 A.3d 1006, 1017 (Pa. Super. 2011) (citations omitted, emphasis added). Additionally,

> [w]hile we have recognized that the veracity of facts establishing probable cause recited in an affidavit supporting a search warrant may be challenged and examined, . . . we have not suggested that every inaccuracy will justify an exclusion of evidence obtained as a result of the search.

- 13 -

*Commonwealth v. Monte*, 329 A.2d 836, 842-43 (Pa. 1974) (citations and footnote omitted). The factual determination of whether a misstatement was deliberately made is within the sole province of the suppression court sitting as fact finder, who is free to believe all, part, or none of the evidence. *See Baker*, 24 A.3d at 1017.

The trial court, in its opinion, addressed Johnson's *Franks* claim as follows:

> In in the instant case, [Johnson] filed a motion to suppress on June 30, 2022, and a suppression hearing was held on August 4, 2022. To meet its burden of proving that the challenged evidence was not obtained in violation of [Johnson]'s rights, the Commonwealth presented the testimony of [] Detective [] Conmy, and introduced surveillance video and photos, a JNET photo, and a search warrant (including the affidavit of probable cause in support thereof).
>
> * * *
>
> In asserting that the affidavit contained a material misstatement of fact, [Johnson]'s suppression motion took issue with the affidavit's statement "[a]s the suspect is seen walking inside Bo's on Main, a clear image of his face is captured." The motion suggested that the "clear image" referenced by the affidavit was a screen capture from an overhead surveillance camera, admitted, according to [Johnson], as Commonwealth Exhibit 11 at a June 10, 2021 preliminary hearing, and attached as Exhibit B to [Johnson]'s suppression motion. [Johnson]'s suppression motion further asserted that "this was the image officers used to identify Johnson as the shooter." The motion averred that it was a material misstatement to describe Exhibit B as a clear image because it was not clear, and further, that without the misstatement, the affidavit did not formulate probable cause that [Johnson] was the shooter, or articulate a nexus between the apartment and the crime.
>
> At the suppression hearing, [] Detective Conmy testified that, as stated in the affidavit, investigators identified [Johnson] as the

shooter from the **surveillance video, based on Detective Conmy's prior contact with** [**Johnson**], **and by comparison of the video to known photographs of** [**Johnson**].

In addressing [Johnson]'s [claim], [the trial c]ourt concluded that it was apparent from the credible testimony and evidence presented that **Detective Conmy identified** [**Johnson**] **from the surveillance video as a whole, which the** [**c**]**ourt specifically found was much clearer than Exhibit B.** Thus, the [c]ourt determined that the affidavit did not contain a misstatement, much less a material misstatement, that would undermine the existence of probable cause.

Trial Court Opinion, 4/19/23, at 3-5 (citations omitted, emphasis added).

After review of the record, we agree with the well-reasoned opinion of the trial court and affirm on that basis. *See id.* Indeed, the testimony at the suppression hearing clearly reflects that Detective Conmy viewed multiple still images, as well as the surveillance video in its entirety, before comparing the individual to other known images of Johnson. *See* N.T. Pre-Trial Hearing, 8/4/22, at 5-49. Therefore, we conclude that the trial court did not err, and Johnson's claim is meritless. *See Jones*, *supra*.

In his second sub-issue, Johnson argues that the search warrant was not supported by probable cause to search for the dark jacket with "White" written on the back and his cellphone data. *See* Brief for Appellant, at 7-8. In particular, Johnson contends that the search warrant fails to mention what jacket the shooter was wearing, or that a cell phone had been employed during the shooting in this case. *See id.* Johnson asserts that without this information, the search warrant lacks probable cause. *See id.*

"Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution guarantee an individual's freedom from unreasonable searches and seizures." ***Commonwealth v. Bostick***, 958 A.2d 543, 550 (Pa. Super. 2008) (citation and internal quotation marks omitted).

> Under the federal and state constitutional prohibitions of unreasonable searches and seizures, both the United States Supreme Court and [the Pennsylvania Supreme Court] have consistently held that, subject to certain exceptions, a search is constitutionally invalid unless it is conducted pursuant to a warrant issued by a neutral and detached magistrate and supported by probable cause. Probable cause exists where, based upon a totality of the circumstances set forth in the affidavit [of] probable cause, including the reliability and veracity of hearsay statements included therein, there is a fair probability that . . . evidence of a crime will be found in a particular place. In reviewing an issuing authority's decision to issue a warrant, a suppression court must affirm unless the issuing authority had no substantial basis for its decision. On appeal, [appellate courts must] affirm[] the decision of the suppression court unless it commits an error of law or makes a factual finding without record support.

***Commonwealth v. Lyons***, 79 A.3d 1053, 1063-64 (Pa. 2013) (citations and internal quotation marks omitted).

In ***Commonwealth v. Harlan***, 208 A.3d 497 (Pa. Super. 2019), this Court "emphasize[d] that 'the totality of the circumstances' set forth in the affidavit must be considered when examining whether probable cause supports the issuance of the search warrant." ***Id.*** at 505. The ***Harlan*** Court noted:

> [T]he question of whether probable cause exists for the issuance of a search warrant must be answered according to the totality of

- 16 -

the circumstances test articulated in **Commonwealth v. Gray**, [503 A.2d 921 (Pa. 1985)], and its progeny, which incorporates the reasoning of the United States Supreme Court in **Illinois v. Gates**, [462 U.S. 213 (1983)]. . . . The task of the magistrate acting as the issuing authority is to make a practical, common[-]sense assessment of whether, given all the circumstances set forth in the affidavit, a fair probability exists that contraband or evidence of a crime will be found in a particular place. A search warrant is defective if the issuing authority has not been supplied with the necessary information. The chronology established by the affidavit of probable cause must be evaluated according to a common[-]sense determination.

Further, probable cause is based on a finding of the probability, not a *prima facie* showing, of criminal activity, and deference is to be accorded [to] a magistrate's finding of probable cause. We must limit our inquiry to the information within the four corners of the affidavit submitted in support of probable cause when determining whether the warrant was issued upon probable cause.

**Harlan**, 208 A.3d at 505 (some citations omitted).

In its Rule 1925(a) opinion, the trial court stated as follows:

Here, . . . the affidavit indicated that video surveillance footage captured the inside and outside of Bo's on Main, before, during, and after the shooting; the footage showed the suspect wearing dark colored clothing; as the suspect was seen walking inside Bo's on Main, a clear image of his face was captured; law enforcement was able to positively identify the suspect as [Johnson], an individual known to law enforcement from past police contacts and from comparison of know[n] images; investigators discovered the existence of [Johnson's girlfriend, Dixon,] who resided in Sherman Hills at 324 Parkview Cr apt #705; video from the area of this address showed [Johnson] arriving at the apartment wearing the same clothing from the shooting incident.

Trial Court Opinion, 4/19/23, at 8 (citations omitted).

After our review of the record, we conclude that the trial court's determinations are supported by the record and, consequently, we do not disturb them. **See Jones**, **supra**. It is clear from the record that the police

- 17 -

identified Johnson as the shooter, were able to identify Johnson a short time later arriving at Dixon's apartment, and, consequently, had probable cause to secure a search warrant to search Dixon's apartment for Johnson and items he carried/wore during the shooting. ***See id.*** Moreover, as we noted ***supra***, Johnson is shown wearing the same jacket in multiple different videos, and that jacket was specifically sought in the search warrant. ***See*** N.T. Pre-Trial Hearing, 8/4/22, Commonwealth's Exhibit 6. Furthermore, the police sought Johnson's phone because he was identified, in part, based upon his Facebook page and the "Times Too" Facebook page. Therefore, considering the totality of the circumstances, the search warrant was supported by probable cause, and Johnson's claim is meritless. ***See Harlan***, ***supra***.

In his third sub-issue, Johnson argues that the search warrant "should have been suppressed because [the] warrant []lacked particularity and [was] overbroad." Brief for Appellant, at 9. Johnson asserts that the warrant "lists the items to be searched for and seized . . . but [] fails to mention the items or does not connect them to [Johnson.]" ***Id.*** at 10. In further support of this claim, Johnson again challenges Detective Conmy's identification of Johnson as the shooter. ***See id.***

As noted above, both the Federal and Pennsylvania constitutions protect citizens from unreasonable searches and seizures by requiring search warrants. ***See*** U.S. Const. amend. IV; Pa. Const. Art. I, § 8. The Fourth Amendment requires warrants to be issued "particularly describing the place to be searched and the person or things to be seized." ***Commonwealth v.***

***Turpin***, 216 A.3d 1055, 1063-64 (Pa. 2019) (citation omitted). Similarly, the Pennsylvania Constitution requires that a search warrant describe things to be seized "as nearly as may be" to prevent general, exploratory searches and "the seizure of one thing under a warrant describing another." ***Commonwealth v. Waltson***, 724 A.2d 289, 291 (Pa. 1998) (citation omitted). "As to what is to be taken, nothing is left to the discretion of the officers executing the warrant." ***Commonwealth v. Moser***, 282 A.3d 850, 856 (Pa. Super. 2022) (citation omitted).

However, search warrants should "be read in a common[-]sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice." ***Commonwealth v. Green***, 265 A.3d 541, 550-51 (Pa. 2021) (citation omitted). "It is permissible to seize things other than those described in the search warrant if they have a reasonable relation to the purpose of the search." ***Commonwealth v. Gannon***, 454 A.2d 561, 565 (Pa. Super. 1982).

In its opinion, the trial court addressed this claim as follows:

Here, the warrant authorized a search for a "dark[-]colored jacket with the word 'WHITE' in light-colored lettering, and light-colored stripes on the back and sleeves of the jacket." As such, the search warrant did not authorize a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize, nor did it authorize the seizure of an entire set of items which would prove unrelated to the crime under investigation. Thus, the [c]ourt did not deem the warrant to violate the particularity requirement, and did not grant suppression of the jacket on these grounds.

Trial Court Opinion, 4/19/23, at 9 (citations omitted).

Our review reveals that the trial court's determinations and conclusions are supported by the record. *See Jones*, *supra*. Indeed, the search warrant describes the "dark[-]colored jacket with the word 'WHITE' in light-colored lettering and light-colored stripes on the back and sleeves of the jacket," "as nearly as may be" based upon the video surveillance and investigation. *See* Trial Court Opinion, 4/19/23, at 9; *see also Waltson*, *supra*. Further, the warrant listed with as much particularity as possible, all of the items which the police intended to seize. *See* Trial Court Opinion, 4/19/23, at 3-5, 9 (summarizing search warrant list of items to be seized). We are prohibited from reading the search warrant in the hypertechnical way as Johnson requests. *See Green*, *supra*. Rather, it is clear from the common[-]sense context of the warrant that the police had seen Johnson wearing the requested items, using a firearm, and a cell phone, and were, therefore, seeking to seize those items. *See id.* Therefore, Johnson's claim is meritless.

In his second claim, Johnson claims that the trial court abused its discretion in issuing a flight charge in the jury instructions. *See* Brief for Appellant, at 11-12.

We conclude that Johnson has waived this claim. Johnson's argument on this claim amounts to a mere one-and-one-half pages and contains only boilerplate citations to our standard of review and bald assertions, with no citations to the record. Accordingly, we conclude that Johnson has waived this claim. *See* Pa.R.A.P. 2119(a) (providing appellant's argument shall

include "such discussion and citation of authorities as are deemed pertinent"); *see also Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("where an appellate brief fails to . . . develop the issue in any [] meaningful fashion capable of review, that claim is waived"); *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (explaining appellant's briefing requirements and duties to "present arguments that are sufficiently developed for our review. . . . This Court will not act as counsel and will not develop arguments on behalf of an appellant.").

In his third claim, Johnson presents three challenges to the weight of the evidence. *See* Brief for Appellant, at 13-15. First, Johnson argues that he is 5'6" and the surveillance video depicts the shooter as the same height as a nearby parking meter, which was measured at 4'9". *See id.* at 13. Second, Johnson asserts that the Commonwealth's DNA expert, Sanney, presented unreliable testimony, where she "could not verify whether PSP followed testing or chain of custody/contamination protocol which could have affected DNA findings." *Id.* at 15. Johnson contends that his own DNA expert, Arthur Young, rebuffed Sanney's testimony by explaining "DNA analysis cannot prove when DNA is deposited on an object." *Id.* Third, Johnson posits that Detective Conmy's identification is inherently unreliable because no other detective was able to identify Johnson until after Detective Conmy had identified him, and because the images Detective Conmy used to identify the shooter had obscured the shooter's eyes. *See id.* at 14.

Preliminarily, we conclude that Johnson's second and third challenges to the weight of the evidence are waived for failure to include them in a timely oral or written post-trial or post-sentence motion. *See* Pa.R.Crim.P. 607(A)(1)-(3) (claims challenging weight of evidence "shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion"); *Commonwealth v. Thompson*, 93 A.3d 478, 491 (Pa. Super. 2014) (failure to preserve weight claim under Rule 607 results in waiver). Instantly, Johnson made an oral post-trial motion at his sentencing hearing. *See* N.T. Sentencing Hearing, 1/4/23, at 2-3. However, in this oral motion, Johnson only challenged the weight of the evidence based upon the height of the nearby parking meter. *See id.* Johnson did not file a post-sentence motion. Consequently, Johnson's challenges to the weight of the evidence of the Commonwealth's DNA expert and Detective Conmy's identification are waived for appellate review. *See Thompson*, *supra*; Pa.R.Crim.P. 607(A)(1)-(3).

Turning to Johnson's preserved weight claim, we adhere to the following standard of review:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the . . . verdict if it is so contrary to the evidence as to shock one's sense of justice.

- 22 -

*Commonwealth v. Small*, 741 A.2d 666, 672-73 (Pa. 1999). Additionally, where the trial court has ruled on the weight claim, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence; rather, our appellate review is limited to whether the trial court abused its discretion in ruling on the weight claim. *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003). The issue is whether the trial court's decision that the verdicts did not shock its conscience; overrode the law; was manifestly unreasonable; or the result of bias, prejudice, or ill will. *See id.* As this Court has often reminded appellants, our "standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Winslowe*, 158 A.3d 698, 712 (Pa. Super. 2017); *see also Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (to allow an appellant "to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks the conscience of the [trial] court").

At the sentencing hearing, but prior to sentencing, the trial court addressed Johnson's claim as follows:

> At this time, the defense motion will be denied[.] And just make note from the [trial c]ourt's perspective that the video of [Johnson] at the scene in his relation to the parking meter does not give an indication as to his exact height given the angle

involved and the cameras . . . including the review of the entire record, the defense motion is denied.

N.T. Sentencing Hearing, 1/4/23, at 4. Additionally, in its opinion, the trial court noted that it expressly disagreed with Johnson's "characterization that the video evidence showed the shooter to be at, or near, the same height as the parking meter." Trial Court Opinion, 4/19/23, at 20 n.7.

After our review of the foregoing, we cannot conclude that the trial court abused its discretion in ruling against Johnson on his weight claim. *See Champney*, *supra*. Consequently, Johnson is afforded no relief on this claim.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/19/2024